[Civ. No. 9562. First Appellate District, Division One.—October 7, 1935.]

MARY T. McCLURE, Respondent, v. JOHN C. GRAHAM et al., Appellants.

354

John B. Ehlen, I. Karmel and Theodore M. Monell for Appellants.

C. K. Bonestell, as *Amicus Curiae* on Behalf of Appellants.

Keyes & Erskine and Ira Abraham for Respondent.

THE COURT.—Plaintiff's cause of action is based upon a real estate transaction. She alleges that the several defendants defrauded her in the sum of $12,500. Issue was joined and after a trial upon the merits the court made and entered its findings of fact and conclusions of law in favor of the plaintiff. Upon the entry of judgment the defendants, except Helen Doyle and Union Indemnity Company of Louisiana, a corporation, appealed. As to the last-named defendant the action was dismissed before trial. ▇ One of the claims of error presented by the several appellants is that as to him or it the evidence is insufficient to sustain the findings of fraud upon which the judgment is predicated. It is too well settled to require the citation of authority that if there is any substantial evidence to sustain a finding this court may not disturb the same. A statement of the evidence is, so far as necessary, as follows:

Mary T. McClure, the plaintiff, testified that she resided in Oakland, California; that she had been a widow for about six years; that prior to her husband's death her occupation was that of housewife; that she was unfamiliar with real estate transactions; that she had known the defendant, Helen

Doyle, for about two years prior to the inception of the real estate transaction hereinabove referred to, and that she had known the defendant Graham for a short time; that her acquaintance with Miss Doyle had been intimate and she had confidence and trust in her and relied upon her in the transaction; that the first conversation upon the subject took place in San Francisco when defendant Doyle told her there was a transaction in defendant Graham's office concerning three pieces of property in San Francisco. One of the pieces of property was situated at the corner of Bush and Leavenworth Streets, another at the corner of California and Buchanan Streets, and another on Fillmore and California. The witness further testified that at a later date Miss Doyle called upon her at her home in Oakland, and while the two were riding in an automobile, defendant Doyle told her that the property was still open, although a little more reduced in price than it had been the first time and she thought it would be a very wonderful thing if the plaintiff took it. "I said to her, 'Helen, is it something you would take if you had the money? I know nothing about real estate, and I am a stranger here in San Francisco. I will have to depend wholly upon you.' She said the equities were worth around $55,000 and the income would be in the neighborhood of five hundred dollars a month, or a little more perhaps." Defendant Doyle was going to get her the property for $10,000 and then something came up which raised the price to $11,000. Also, she was required to advance another $500, and then at a still later date she again advanced another $1,000 which defendant Doyle claimed was necessary to save what had already been paid. The above payments were made as follows: On July 8, 1931, plaintiff gave her check to defendant Helen Doyle for $1,000, which was indorsed by the latter to the defendant Northern Counties Title Insurance Company and delivered to defendant Graham. On August 3, 1931, plaintiff gave another check for $10,000, payable to City Title Insurance Company, and on the same day she gave another check payable to the City Title Insurance Company for $500. The last two checks were sent by plaintiff to defendant Graham's office, and the $1,000 check which was given "to save the property", as aforesaid, was given to defendant Doyle. After the plaintiff had given the first three checks, which amounted to the sum of $11,500, defendants Doyle and Graham failed to pur-

chase the three apartment houses which plaintiff McClure had agreed to buy, and without her knowledge or consent the money thus paid was used to purchase one apartment house referred to as the "Bush Street Apartment", of which Graham became manager. The title thereto was taken as follows: At the request of defendant Graham a deed of trust was executed in which one Warfield appeared as trustor, the Northern Counties Title Insurance Company as trustee, and defendants Keddie and Egan as beneficiaries under the designation "trustees". A holding agreement was prepared by Keddie and executed at the same time, which recited that Keddie and Egan were acting as trustees for defendants Doyle and Graham. A chattel mortgage on the furniture in the apartment house was also executed by Warfield to Keddie and Egan as additional security and was included in the above-mentioned holding agreement, and the amount specified in the trust deed and chattel mortgage as the consideration therefor was the sum of $17,000. It does not appear clearly why the above consideration was named, but when later questioned by Mrs. McClure when the matter was called to her attention, it was stated by defendants Doyle and Graham that it was so she would have a greater interest in the property. At another time Graham said the additional sum was a profit for Mrs. McClure. All of the instruments were executed and deposited with the City Title Insurance Company on or about the first of August, 1931, and the money deposited by plaintiff for the payment of the three apartment houses was under the instructions of Graham used for the purchase of this apartment house. After the transaction was closed and respondent discovered the trust deed was taken in the name of Warfield she asked defendant Doyle the reason; the latter said that was customary in such deals and she thought it best that respondent's name should not appear. The latter said she would rather her name be kept out. It also appears from plaintiff's evidence that her attention was not called to this substitution of the one apartment house until January, 1932; and, further, it appears that the note, trust deed and chattel mortgage which were taken to secure plaintiff's money were taken without the knowledge of plaintiff, subject to another trust deed and chattel mortgage held by other parties to secure the sum of $103,000, and that the property was subsequently sold by virtue of the last-named trust deed, and the

security for plaintiff's money was lost and the obligation itself became worthless. It is clear from the record that the actual handling of the transaction was carried on through defendants Graham and Doyle. True, defendant Graham testified that the plaintiff was informed of the purchase of the one apartment house and that she assented thereto before the deal was made, but this was denied and consequently merely created a conflict in the evidence. It is further claimed by appellant Graham that defendant Doyle was plaintiff's agent exclusively and not his; that all the alleged fraudulent representations were made to plaintiff by defendant Doyle and were unknown to him. We think this is answered by the evidence that appellant Graham knew that all the money which was to be used for the purchase of the property belonged to plaintiff McClure; that the deal was handled by him; that he arranged with defendant Keddie to have the title to the property passed to him by a deed of trust which concealed any interest that he, Graham, had in the property. Further, that his real interest therein was represented by the holding agreement between himself and defendant Doyle on the one side and the beneficiaries named in the trust deed on the other; that by this means he was secretly using plaintiff's money for his own benefit. Therefore it is a logical conclusion that appellant Graham and defendant Doyle were acting in harmony to defraud plaintiff and respondent, and did thereby defraud her of the sum of $12,500.

It is further claimed by appellant Graham that he is entitled to a credit on the judgment in the sum of $1,000 paid by respondent McClure in March, 1932, at the request of defendant Doyle, for the purpose of saving the investment already made by respondent. The money was paid into the hands of Doyle and used by the latter and Graham in furtherance of the fraud, and both parties are therefore liable for the sum so paid.

Another claim advanced by Graham is to the effect that the sum of $957.50 paid by Graham and Doyle to respondent as rental should also be credited on the judgment. At the time the money was paid respondent was the equitable owner of the apartment house and entitled to the sum of money thus paid. The evidence of both Graham and Doyle stated that the money thus paid was rental. We are of the opinion that the point is without merit.

We come now to a consideration of the appeals by the defendants Northern Counties Title Insurance Company, a corporation, hereinafter referred to as the "title company", Alex Keddie and E. J. Egan. The undisputed evidence in relation to the connection of these defendants with the cause of action may be epitomized as follows: Appellant Keddie was during all of the times mentioned secretary of the title company, and appellant Egan was an employee of said title company. When respondent gave her first check for $1,000 to defendant Doyle, the latter indorsed the same to the title company, but delivered it to appellant Graham, who in turn delivered it to Keddie. It is clear that this check was a deposit by respondent on the purchase price of the three apartment houses, and when the purchase was no longer under consideration by appellants Graham and Doyle, the one thousand dollars was returned to Graham by Keddie. The next appearance by any of these three appellants was about August 4, 1931, when Graham met Keddie on the street and requested the latter to hand to the City Title and Insurance Company, another corporation, three checks payable to the latter corporation. Two of them aggregated $10,500, and were signed by respondent. The third was for the sum of $500 and signed by Graham. At this conversation Graham advised Keddie that he had a deal on for a lady client who did not want her name known in the transaction and asked if the title company could act as a beneficiary in a trust deed. Keddie replied that it could not. It was then agreed between Graham and Keddie, as an act of accommodation to the former, that a trust deed should be executed in which one Warfield should appear as trustor, the title company as trustee, and Keddie and Egan as beneficiaries under the designation "trustees". A holding agreement was to be executed at the same time, which would recite that Keddie and Egan were acting as trustees for Doyle and Graham. A chattel mortgage on the furniture in the apartment house was also executed by the same parties as additional security. All of the instruments were executed and delivered to the City Title and Insurance Company, which acted as escrow holder in the matter. These instruments were later recorded at the request of the title company except the holding agreement which was not recorded. The amount specified in the trust deed and chattel mortgage was $17,000. It is not clear just

why this figure was used instead of the $10,500 paid by respondent, but at one place in the testimony of Graham the additional sum was said by him to be a profit to respondent.

It is undisputed that at the time Graham asked Keddie to deposit the checks with the City Title and Insurance Company he did so and gave the receipt of the title company therefor, as well as delivered the instructions of Graham to the City Title and Insurance Company, one of which was that the instruments were not to be recorded except under the instructions of Graham. All subsequent handling of the money was through the escrow by the last-named company. It is also undisputed that neither of these three appellants ever received any consideration for the transaction. It is true, however, that Keddie and Egan made the affidavit of good faith to the chattel mortgage without any investigation as to the truth of the facts stated therein. It is also true that there is an entire lack of evidence that Keddie intended to defraud, unless there is an inference that his failure to inquire concerning the transaction constituted fraud. It was stipulated that if Egan were present at the trial, his evidence would have been the same as that of Keddie. It is also undisputed that respondent never met Keddie or Egan.

We have stated above all of the material evidence, and the question now presents itself—does such evidence sustain the findings of the court that the title company, Egan or Keddie were guilty of fraud, or conspired with the codefendants to commit fraud? After reading the entire record in this case, including all the evidence, we are satisfied neither Keddie nor Egan were guilty of fraud or of any conspiracy with their codefendants to commit fraud; that in their part of the transaction set forth in the complaint they were merely acting as an accommodation to their codefendant Graham, and that respondent McClure was relying upon Graham and Doyle. We are of the opinion that the following cases are in point:

*Ryder* v. *Bamberger*, 172 Cal. 791, at page 800 [158 Pac. 753, 756], where it is said: "For fraud must always be proved, so that when the plaintiff's case goes no further than to establish a state of fact from which the inference of fraud may or may not be reasonably drawn, he has failed to establish his charge by a preponderance of the evidence, and it becomes the duty of court or jury, as has been said, to find in favor of innocence and uprightness."

*Adkins* v. *Potter,* 211 Cal. 512, at page 519 [296 Pac. 285, 288], where it is said: ''Even assuming without deciding that an inference of participation by either of the Potters in the fraudulent conduct of Wilbur could be drawn from the evidence, the inference of nonparticipation on their part is at least equally reasonable and equally susceptible. If either conclusion is equally reasonably inferable, 'the one favoring fair dealing and the other favoring corrupt practice, it is the express duty of the court or jury to draw the inference favorable to fair dealing'.''

*Arakelian* v. *Sears,* 53 Cal. App. 646, at page 653 [200 Pac. 757, 761], where it is said: ''The law presumes that a person is innocent of crime or wrong; that private transactions have been fair and regular; that the ordinary course of business has been followed (sec. 1963, Code Civ. Proc.) ; and inference of good faith rather than fraud should be indulged and the presumptions against fraud must be overcome by him who alleges improper conduct (*Levy* v. *Scott,* 115 Cal. 39 [46 Pac. 892], or, as stated in *Roberts* v. *Burr,* 135 Cal. 156 [67 Pac. 46], 'the evidence of the facts and circumstances, taken together, must amount to proof of fraud, and not to a mere suspicion thereof'.''

*Best* v. *Paul,* 101 Cal. App. 497, at page 499 [281 Pac. 1089, 1090], it is said: ''The presumption against fraud approximates in strength the presumption of innocence of crime (27 Cor. Jur. 44, sec. 170; *Truett* v. *Onderdonk,* 120 Cal. 581, 588 [53 Pac. 26]), and this presumption is evidence.''

*Bahen* v. *Furley,* 44 Cal. App. 134 [186 Pac. 185]. The principle involved is the same as in the case at bar, and is declared in the syllabus as follows: ''Where property is acquired from the owner through fraud and deceit and title is taken in the name of one not a party to the fraud, but the latter has no knowledge or notice of the fraudulent transaction and does not participate in any of the proceeds from the subsequent disposition of the property, he cannot be held liable to the defrauded owner in an action for damages because of the fraud.'' This case is also authority upon the point that under the above circumstances the party in whose name the title is taken is not put upon inquiry as to the fraud committed by others and of which he had no knowledge. In the case at bar there is an entire lack of evidence of knowledge on the part of either Keddie or Egan of the fraud perpe-

trated by Graham and Doyle. It also appears that neither received any of the proceeds of the fraudulent transaction. We are of the opinion that appellants Keddie and Egan are entitled to a reversal of the judgment as to each one of them.

If we are correct in our analysis of the evidence that neither Keddie nor Egan were guilty of fraud or of a conspiracy to commit fraud, it necessarily follows that the judgment against the appellant title company must be reversed.

Other questions have been presented by the briefs ·of the parties but under the conclusions above reached it becomes unnecessary to consider them.

The judgment against John C. Graham is affirmed, respondent to recover her costs as to him. The judgment against the Northern Counties Title Insurance Company, a corporation, Alex Keddie and E. J. Egan is, as to each one, reversed, with directions to the trial court to enter judgment in their favor with their costs.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 5, 1935.